

## Fourth Court of Appeals
### San Antonio, Texas

### OPINION

No. 04-24-00279-CR

John Steven **MEYER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2024CR0170
Honorable Stephanie R. Boyd, Judge Presiding

Opinion by:     Adrian A. Spears II, Justice

Sitting:     Irene Rios, Justice
            Lori Massey Brissette, Justice
            Adrian A. Spears II, Justice

Delivered and Filed: April 29, 2026

REVERSED AND RENDERED

After a jury trial, John Steven Meyer was convicted of possessing a controlled substance, specifically methamphetamine, in an amount greater than four grams but less than 200 grams. He brings seven issues on appeal. Because we conclude the evidence is legally insufficient to show that Meyer possessed methamphetamine, we reverse the trial court's judgment and render a judgment of acquittal.

**BACKGROUND**

At trial, Deputy Jorge Rios testified that on August 5, 2022, he and his partner, Deputy Jesus Salazar, "were working on some tips [their] agency had received in regards to" a house located at 224 Majestic Grove in San Antonio, Texas, and were "covertly surveil[ling]" the house to "see if the information [their agency was] receiving was actually happening at that address." According to Deputy Salazar, "Our unit received a tip in regard to possibly narcotics or some sort of prostitution going on at the residence." The deputies, who were in plainclothes and in an unmarked car, surveilled the house from 6:00 a.m. to around noon, "observ[ing] a lot of vehicles and [a] little bit of foot traffic there at the residence." When asked how much "foot traffic" they observed, Deputy Salazar estimated three or four people. The deputies decided to return for more surveillance, and on August 8, 2022, they again began their surveillance at 6 a.m.

The deputies did not see any comings and goings at the house until 1:20 p.m. when a woman, later identified as Melissa Yanez, left the home with a bright pink bag and got into a black Jeep. Yanez was followed by Deputy Jeffrey Suarez and was stopped for speeding. Deputy Suarez asked Yanez if he could search the vehicle, and she refused. Deputy Suarez then called a K-9 unit. The K-9 unit arrived, and the dog alerted. Deputy Suarez searched the black Jeep and found 370.26 grams of methamphetamine, $3,670 in cash, digital scales, and baggies. Deputy Brian Wolfe then prepared an affidavit and search warrant for the house from which Yanez had left. After the warrant was signed by a magistrate, the deputies entered the house to conduct a search.

Deputy Mark Molina guided the K-9 dog throughout the house. Video taken from his body camera of the K-9 search was admitted in evidence. The video shows that the house was in disarray with belongings strewn about the house. The house appeared to be undergoing some sort of remodeling, with concrete floors, open walls and sheetrock removed. Ladders and construction

tools can be seen throughout the house. Also seen on the video in a common area was a television with video from security cameras. When asked what footage was found on the security cameras, Deputy Salazar replied that he had "no idea" and that he did not look at any footage.

When the search warrant was served, Meyer was present in the house. No contraband was found on Meyer's person. Meyer and three other occupants were placed in a room, and Deputy Salazar read them their *Miranda* rights. The deputy asked if there were any weapons in the house, and Meyer replied, "There is one small caliber pistol in my room." A small-caliber pistol was recovered in the master bedroom of the house. No other firearms were recovered during the search. Meyer's driver's license and mail, addressed to Meyer at 224 Majestic Grove, were found in the master bedroom. The State and Meyer stipulated at trial that Meyer had provided 224 Majestic Grove to Bexar County Pretrial Services as his address after his arrest.

The methamphetamine with which Meyer was charged was found in a pill bottle on the counter of the ensuite master bedroom. Also found in the master bathroom was a pill bottle of morphine with a prescription label showing the name Katherine London. Meyer was charged with one count of possession of a controlled substance, namely methamphetamine, in an amount of four grams or more but less than two hundred grams. He was also charged with one count of possession of a controlled substance, namely morphine, in an amount of one gram or more but less than four grams. The jury found Meyer not guilty of possessing morphine, but found Meyer guilty of possessing methamphetamine. He was sentenced to ten years of imprisonment. His sentence was suspended, and he was placed on community supervision for a period of ten years. Meyer then appealed.

**LEGAL SUFFICIENCY**

On appeal, Meyer argues the evidence is legally insufficient to support his conviction because the evidence shows "mere presence." In assessing the legal sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "Although the State must prove that a defendant is guilty beyond a reasonable doubt, the State's burden does not require it to disprove every conceivable alternative to a defendant's guilt." *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). "In a sufficiency inquiry, direct evidence and circumstantial evidence are equally probative." *Id*.

"The jury is the sole judge of the weight and credibility of the evidence." *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). "When considering a claim of evidentiary insufficiency, we must keep in mind that a juror may choose to believe or disbelieve all, some, or none of the evidence presented." *Id*. "Further, while jurors may not base their decision on mere speculation or unsupported inferences, they may draw reasonable inferences from the evidence." *Id*. "The evidence is sufficient to support a conviction, and thus the jury's verdict is not irrational, if 'the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict.'" *Id*. at 655-56 (quoting *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012)). "When faced with conflicts in the evidence, a reviewing court shall presume that the fact finder resolved those conflicts in favor of the verdict and defer to that determination." *Id*. at 656.

"We measure the sufficiency of the evidence against the hypothetically-correct jury charge, defined by the statutory elements as modified by the charging instrument." *Id*. Meyer was indicted for intentionally or knowingly possessing a controlled substance, namely methamphetamine, in an amount greater than four grams but less than 200 grams. *See* TEX. HEALTH & SAFETY CODE § 481.115(a), (d). Thus, the State had to prove Meyer exercised care, custody, control, or management over methamphetamine and knew the substance was methamphetamine. *See id*. §§ 481.002(38), 481.115(a).

At trial, the evidence showed that multiple people were inside the house right before it was searched. Twenty-five minutes after Yanez left the house in the Jeep, a male and female were seen leaving the house in a yellow Penske box truck. John Sparks, the male, was later charged with possession of methamphetamine, which was found in a room that was believed to belong to him. Deputy Salazar testified there were seven people in the house. Additionally, with respect to the master bathroom and master bedroom, Deputy Molina and Deputy Ma testified there were women's clothes scattered throughout the master bedroom and master bathroom and that there were brassieres, dresses, blouses, and purses hanging in the master bedroom closet. Thus, looking at the evidence in the light most favorable to the jury's verdict, the evidence shows that the house was occupied by many people immediately before the search and that Meyer shared the master bedroom and ensuite master bathroom with a female. Because the place where the methamphetamine was found was a shared space, Meyer argues that the evidence merely shows that he was present in a place where the methamphetamine was found.

"A defendant's mere presence is insufficient to establish possession." *Tate*, 500 S.W.3d at 413. Whether evidence "is direct or circumstantial, 'it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous.'" *Poindexter*

*v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005) (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). "This is the whole of the so-called 'affirmative links' rule." *Id*. When "the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances [that] affirmatively link the accused to the contraband." *Id*. (quotation omitted). "The 'links' rule is not an independent test for legal sufficiency but is merely a shorthand catchphrase for the myriad variety of circumstantial evidence that may establish knowing 'possession' or 'control, management, or care' of contraband." *Havelka v. State*, 224 S.W.3d 787, 789 (Tex. App.—Eastland 2007, no pet.) (citing *Evans v. State*, 202 S.W.3d 158, 161-62 n. 9 (Tex. Crim. App. 2006)).

"The 'affirmative links rule' is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs." *Poindexter*, 153 S.W.3d at 406. "This rule simply restates the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the contraband found in that house." *Id*.

Under the affirmative links rule, "[w]hen the contraband is not in the exclusive possession of the defendant, a fact finder may nonetheless infer that the defendant intentionally or knowingly possessed the contraband if there are sufficient independent facts and circumstances justifying such an inference." *Tate*, 500 S.W.3d at 413-14. The evidence need not show *exclusive* possession of the contraband, as control may be jointly exercised by more than one person. *See McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985) ("It is well settled though that an accused may with another or others jointly possess dangerous drugs or narcotics and that such possession need not be exclusive."). The court of criminal appeals has explained that a non-exclusive list of

factors may help guide a court's analysis. *Tate*, 500 S.W.3d at 414. Those factors include: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Id*. "Although these factors can help guide a court's analysis, ultimately the inquiry remains that set forth in *Jackson*: Based on the combined and cumulative force of the evidence and any reasonable inferences therefrom, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Tate*, 500 S.W.3d at 414 (citing *Jackson*, 443 U.S. at 318-19).

In considering these non-exclusive factors, we note that Meyer was present when the search was conducted and had access to the master bedroom and ensuite bathroom. Meyer did live at the house. There was no testimony that Meyer was under the influence of narcotics when arrested. In the video where Meyer was given his *Miranda* rights, he does not appear to be under the influence of narcotics. Meyer did not possess other contraband or narcotics when arrested. Meyer was not in possession of a large amount of cash. He did not make any incriminating statements about narcotics when arrested. He did not attempt to flee. He did not make furtive gestures. There was no testimony

about whether there was an odor of contraband. Other contraband, methamphetamine, was found in a different bedroom, and another person was charged with possessing it.

The question then becomes whether the methamphetamine found in the master bathroom was in plain view. At trial, Deputy Molina testified that when he conducted the K-9 search, the dog would alert by sitting, and he would then tell a person following him about the alert:

> So, [the dog is] on the sink counter. Right there he'll give you an alert. So, I believe—I can't recall exactly what we found, but there would be somebody behind me. And I'll tell them, "Hey, he alerted right here." They'll seat [sic] it. They'll remember. So, I guess, when we're done, everybody comes in. And they start. They'll start checking areas where I had told them.

Deputy Molina could not testify as to how the pill bottle with the methamphetamine that was found in the master bathroom appeared when the dog alerted.

Deputy Jorge Rios was asked to look at Defendant's Exhibit 11, which showed the pill bottle. The pill bottle appeared to be stuffed with plastic and had its cap sitting on top of the bottle. Deputy Rios testified that it looked like the pill bottle with methamphetamine inside of it. However, when asked if the pill bottle in Defendant's Exhibit 11 was "something that [he] saw [him]self," Deputy Rios testified, "I don't recall if I saw it myself." He further testified that he did not take the pictures of the pill bottle and that it was Deputy Salazar who did. Deputy Rios was again asked whether Defendant's Exhibit 11 depicted the condition of the pill bottle when he first saw it. Deputy Rios again testified that he did not recall. Deputy Rios was asked whether the lid was on the pill bottle when it was found. Deputy Rios testified that he did not know. Deputy Rios was asked whether there was an item in the pill bottle when he saw it. Deputy Rios again testified that he did not recall. He was then asked whether he "recognize[d] seeing this pill bottle in that residence on that day." Deputy Rios replied, "Yes."

Deputy James Ma testified he took part in the search of the house. According to Deputy Ma, the deputies were assigned areas to search by the investigating agent, Deputy Salazar. Deputy Salazar contradicted Deputy Ma's testimony, stating that neither he nor Deputy Rios assigned people to search the house. When asked who did assignments, Deputy Salazar replied, "Supervisors. The sergeants on scene." When asked which ones, Deputy Salazar stated that "it was either Sergeant Gamboa or Sergeant Henricks." Neither Sergeant Gamboa nor Sergeant Henricks testified at trial. Deputy Salazar testified that he did not have anything to do with assigning people to search the house and that he "just went in and collected the evidence after the search was completed." Deputy Salazar was informed that Deputy Molina had testified that he had a person following him during the K-9 search. Deputy Salazar was asked if he knew who Deputy Molina's spotter was. Deputy Salazar replied, "No." When asked how to find out who the spotter was, Deputy Salazar replied that they could "ask Deputy Molina." Deputy Salazar was informed they did ask Deputy Molina and he testified he did not know. Deputy Salazar again replied that he did not know who the spotter was.

Deputy Salazar reiterated that he did not conduct the search and that his duties began "after the search was completed" and consisted of going "behind and collect[ing] all the evidence involved." Deputy Salazar explained,

> So, after the search is completed, the officers who conducted the search will let me know where the drugs are in the room. And I will go to those rooms that they are claiming the narcotics are in. I then take pictures of the narcotics. I gather the narcotics, and I package them up for the lab to test.

Deputy Salazar was asked about the "standard operating procedure for" one of the deputies finding illegal drugs during a search. Deputy Salazar testified that the standard operating procedure was for the deputy "to inform [him] that the drugs are there." Deputy Salazar testified that in that situation the deputy "normally stands there and secures that and makes sure nobody comes in and

out, nobody tampers with it until [Deputy Salazar] come[s] and collect[s]." When asked what he does when he collects the narcotics, Deputy Salazar testified, "Normally, my procedure is I take pictures. I will test. I will package and then transport them to the Bexar County property room."

Deputy Salazar testified that he and Deputy Rios were the lead officers on the case and that they were both in charge. Deputy Salazar was asked whether there was "any kind of log kept about the scene where everybody coming and going on the team has to sign in at some point." Deputy Salazar replied, "No." Deputy Salazar was then asked whether he made "any effort to record how many or who or which officers went inside at any point in time?" Deputy Salazar again replied, "No."

Noting that Deputy Salazar had testified he was responsible for collecting the evidence, defense counsel asked him at what point he decided to start collecting the evidence. Deputy Salazar replied, "Once everybody finds it and they tell me it's there, I just start collecting." Defense counsel asked, "So we don't know who 'everybody' is; correct?" Deputy Salazar testified, "Correct." Deputy Salazar was asked whether he knew "the name of a single person who saw this evidence for the first time themselves." Deputy Salazar replied, "I do not. I was not a part of the search." Deputy Salazar testified that he could not recall which deputy came to him and told him about the blue methamphetamine found in the pill bottle in the master bathroom. Defense counsel asked Deputy Salazar whether it was in his notes who this person was. Deputy Salazar replied, "No." Deputy Salazar was asked the reason why he did not write down the names of the people who actually located the evidence. Deputy Salazar stated, "We didn't feel the need for a ledger." Deputy Salazar was then asked if he had a ledger, would he be able to answer the questions about who had first found the pill bottle in question. Deputy Salazar replied, "Yes." Defense counsel

then asked, "So we don't know who found the blue rock [of methamphetamine]; is that correct?" Deputy Salazar replied, "Correct."

Deputy Salazar was then asked about where "the blue rock, the blue methamphetamine" was found. Deputy Salazar replied, "In the master bathroom." Defense counsel noted that Deputy Salazar had been told that but did not know who found it. Deputy Salazar replied, "Correct." Deputy Salazar confirmed that he did not know whether the pill bottle with the methamphetamine had been moved before he took the picture of it. He did not know how the pill bottle had been found.

Deputy Salazar was then asked to compare State's Exhibit 40 with Defendant's Exhibit 11. State's Exhibit 40 shows the pill bottle open with a plastic baggie laid out before it and a blue ball inside the plastic baggie. Defendant's Exhibit 11 shows the pill bottle with plastic wrapped up inside it and the cap sitting on top of the bottle. The blue ball is not clearly visible in Defendant's Exhibit 11. Deputy Salazar testified that he could not tell if it is the same bottle in both exhibits. However, he admitted that he took the photos in both exhibits. Deputy Salazar was then asked about the condition of the pill bottle in both exhibits:

> Q: Okay. And you took both pictures. So why did you take this picture? Why did you take Defendant's Exhibit 11? For what purpose? Unless you had a purpose for taking it, why?
> A: Because that little pill sitting at the bottom of it.
> Q: You took the pictures. So, isn't it a fact, sir, that that is how it looked at some point in time, and then later somebody took something out of that orange bottle, took the top off of it, and laid it out? Does that make sense to you?
> A: I can't determine if somebody did that or not.
> Q: Who would have done that? I mean, you're responsible for the evidence. You said it hadn't been moved. I'm just asking. Do you know?
> A: No.

With regard to the blue ball, which was later determined to be methamphetamine, Deputy Salazar was asked what he believed the blue substance to be when he first saw it:

Q:     You didn't—when you first saw this—whoever saw it before you, when you first saw it, the blue stuff, you didn't even know what it was, did you?
A:     Correct.
Q:     How long have you been a narcotics officer?
A:     Two years.
Q:     Two years. Okay. So, you've had some experience at it.
A:     Correct.
Q:     Trained narcotics officer. You're taught to identify things that you're likely to come in contact on the street with, aren't you?
A:     Correct.
Q:     Because what you have to do sometimes is you collect something, and you might be able to say, "Well, that's not contraband." Or you might say, "That could possibly be contraband"; right?
A:     Correct.
Q:     And then your function at that point or somebody with you would field test it; right?
A:     Correct.
Q:     And know you know the field test is not—it—sometimes field tests are inaccurate; correct?
A:     Correct.
Q:     So, it has to go to a laboratory for final confirmation?
A:     Correct.
Q:     But here, you—you didn't even recognize this stuff as illegal, did you?
A:     Correct.
Q:     But once you got the positive test, you said, "Okay, it's probably illegal."
A:     Correct.

Thus, even in the light most favorable to the verdict, the evidence shows that no witness who testified at trial had knowledge about the condition of the pill bottle when it was first discovered. Further, the video from Deputy Molina's body camera and the still pictures from that video footage admitted in evidence do not show the condition of the pill bottle in question during the K-9 search. Additionally, even if there was evidence that the pill bottle was opened at the time of the K-9 search and the plastic baggie with the blue substance was strewn out on the counter, Deputy Salazar testified that in his experience, the blue substance was not recognizable as methamphetamine and that he did not recognize the substance as illegal when he first saw it. Accordingly, even in the light most favorable to the verdict, there is no evidence from which a rational fact finder could determine that the blue substance in question was in plain view and that

Meyer should have recognized that blue substance as a controlled substance upon seeing it on the counter.

We note that the State relies on the following cases to argue that the evidence is sufficient to affirmatively link Meyer to the methamphetamine at issue: *Tate v. State*, 500 S.W.3d 410 (Tex. Crim. App. 2016); *Nhem v. State*, 129 S.W.3d 696 (Tex. App.—Houston [1st Dist.] 2004, no pet.); and *Classe v. State*, 840 S.W.2d 10 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). However, all these cases are distinguishable from the facts presented here.

In *Tate*, 500 S.W.3d at 412, the appellant was driving a vehicle that was stopped by police for a traffic violation. Also in the vehicle were two female passengers: one in the front seat and one in the back seat. *Id*. After approaching the vehicle, the police officer asked the appellant to get out of the vehicle, and the officer and the appellant walked to the back of the vehicle. *Id*. The appellant told the officer that he owned the vehicle. *Id*. After the officer confirmed that the appellant had outstanding warrants, he arrested the appellant. *Id*. The officer testified that looking through the back window of the vehicle, he could see the front-seat passenger moving around a lot, and "although he could not exactly tell what she was doing, he never saw her reach in the direction of the air-conditioning and heating controls." *Id*. With the passengers' consent, their purses were both searched, and no contraband was found. *Id*. During an inventory search of the car, "a syringe loaded with a brown liquid substance that was later identified as .24 grams of methamphetamine" was found in "a compartment underneath the air conditioner, heater control." *Id*. The officer "described the compartment as 'directly to the right' of the driver's seat." *Id*. The appellant "maintained that one of the passengers put the syringe in the compartment after [the officer had] instructed him to get out of the vehicle." *Id*. In concluding the evidence was sufficient to support the appellant's conviction for possession of a controlled substance, the court of criminal

appeals held that in viewing the evidence in the light most favorable to the conviction, the jury could have reasonably believed the police officer's "testimony that he could generally see what the front-seat passenger was doing, that he never saw her reach for the compartment, that the back-seat passenger could not reach it, and that the syringe was *found by police in the cubby in plain view*." *Id*. at 416-17 (emphasis added). According to the court, "[b]ased on that, the jury could have then reasonably inferred that the passengers did not put the syringe in the compartment, so it must have been in there the whole time." *Id*. at 417. The court of criminal appeals also emphasized that as the appellant stated he was the owner of the car, it was reasonable for a fact finder "to infer that the owner-driver would be aware of items in his vehicle *in plain view*." *Id*. (emphasis added). In the present case, however, there is no evidence to support an inference that the methamphetamine in the master bathroom was in plain view.

In *Nhem*, 129 S.W.3d at 697, the court of appeals considered whether the evidence was sufficient to support the appellant's conviction for possession with intent to deliver a controlled substance, specifically cocaine. During a pat-down search for weapons, the police "discovered a pill bottle in appellant's pocket that contained what appeared to be crack cocaine." *Id*. at 698. Then, during a search of appellant's residence, the police officers found "[i]n a bedroom of the residence, between bed mattresses," "two pill bottles containing 38 crack cocaine rocks." *Id*. "Under the bed, the officers found mobile telephone bills in appellant's name, and, on a dresser in the same bedroom, the officers found appellant's driver's license." *Id*. The court noted that the appellant had not been in exclusive control of the house because his mother, father, and brother's girlfriend were inside the house when the appellant was arrested. *Id*. at 700. According to the court, its "legal sufficiency analysis . . . turn[ed] on whether enough evidence existed for any rational jury to find beyond a reasonable doubt that appellant had knowledge of the presence of the cocaine rocks." *Id*.

In holding the evidence was sufficient to support his conviction, the court concluded that "appellant's possession of cocaine of the same type and packaging as the cocaine found in the bed and the close proximity of appellant's driver's license and mobile telephone bills to the cocaine found in the bed, is sufficient for a rational jury to have affirmatively linked appellant to the cocaine rocks in the bedroom." *Id*. In the present case, however, Meyer was not found in possession of a controlled substance on his person. Thus, unlike in *Nhem*, Meyer was not found with evidence on his person that could connect him to the methamphetamine found in the master bathroom.

In *Classe*, 840 S.W.2d at 11, the evidence showed that the police had been surveilling a house for ten days and had repeatedly seen activity at the house consistent with narcotics trafficking, which the police described as "many people came, stayed a short time, and left." On the day the police executed the search warrant, they saw "more than four or five people" enter the house, "stay for a minute or two, and leave." *Id*. "Except for the brief visitors, appellant was the only person in the residence during this period." *Id*. "As the police approached to execute the warrant, they saw appellant alone in the front living room, talking on the phone." *Id*. "When appellant saw them, he ran toward the back of the residence" and was found by the police hiding in a closet in a bedroom. *Id*. The police searched the house and found over a pound "of cocaine inside the boxsprings of a new mattress that had no sheets or pillows." *Id*. The police found "appellant's driver's license from his wallet on his person, and seized a telegram and a sales receipt from the front living room table." *Id*. "Each of these documents listed the residence as appellant's address." *Id*. Further the "police concluded that other people lived in the residence because they found men's and women's clothes" in the bedrooms. *Id*. 11-12. In considering all the evidence and the circumstances surrounding the search of the house, the court of appeals held the following evidence sufficiently linked the appellant to the cocaine:

that appellant occupied the residence; that the police saw activity at the residence consistent with narcotics trafficking for approximately 10 days before executing the warrant; that during the three and one-half hours before executing the warrant, the police saw more brief visits consistent with narcotics trafficking, at a time when appellant was the only other person in the residence; that appellant was alone in the residence when the police executed the warrant; that appellant fled when he saw the police; that men's clothes were found in [the] bedroom [] where the contraband was seized; that a large amount of contraband was seized; and that appellant had $1,966 in cash on him when arrested shortly after the police observed narcotics activity at the residence.

*Id*. at 12. In rejecting appellant's argument that he was merely present when the residence was searched, the court of appeals emphasized that there was "evidence that appellant occupied a premises that was used for drug sales, that he had access to" the bedroom where the drugs were found, "that he was alone in the residence at the time of the search, and that he attempted to flee upon seeing the police." *Id*. at 13. Here, Meyer did not attempt to flee upon seeing the police. Nor was he the only person present when activity consistent with drug activity was seen occurring at the house. Thus, the facts in *Classe* are distinguishable.

In considering the totality of all circumstances in the light most favorable to the jury's verdict, we conclude the following: There was evidence that Yanez possessed methamphetamine in the house owned by Meyer. She was found with methamphetamine in her possession shortly after leaving the house. However, there is no evidence to support an inference that Meyer had any knowledge of Yanez possessing contraband in his home. Further, as explained previously, there is no evidence to infer that the methamphetamine in question was in plain view. Thus, one cannot reasonably infer that, by his ownership of the home, Meyer should have known about the methamphetamine in the master bathroom. Additionally, the videos and pictures of the house admitted in evidence depict an unkempt house in disarray with items thrown about. They also show sheetrock missing from interior walls, cement floors, ladders, tools, saws, and other construction tools throughout the house. The State emphasizes that State's Exhibits 28 and 31,

which are still photos from the master bathroom, show a large propane torch, which the State argues "could be used for smoking methamphetamine." However, while the still photographs admitted in evidence do show a large torch, there was no testimony from any witness about how this torch could be used for smoking methamphetamine or whether such a torch is generally used to smoke methamphetamine.

We conclude that the combined and cumulative force of all the evidence, even when viewed in the light most favorable to the jury's verdict, does not support an inference that by his ownership of the home, Meyer knew about the methamphetamine in the master bathroom and exercised care, custody, control, or management over it. *See Roberson v. State*, 80 S.W.3d 730, 742 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding evidence insufficient to support conviction where appellant was driver of car containing two passengers, cocaine was found near where appellant's cousin had been sitting, there was no drug odor in the car, appellant was not under the influence of drugs, no drugs or money was found on his person or near the driver's seat, appellant was cooperative throughout the traffic stop and made no furtive gestures, and appellant and two passengers made no statements connecting appellant to the cocaine); *see also Jenkins v. State*, 76 S.W.3d 709, 717-19 (Tex. App.—Corpus Christi-Edinburg 2002, pet. ref'd) (holding evidence legally insufficient to sustain a conviction for possession of marihuana and cocaine where the appellant, a passenger sitting in the front seat of a car, was not close to the contraband, did not have convenient access to the contraband, was not intoxicated or indicate recent consumption of the contraband, did not attempt to flee, and did not make any incriminating statements).

## CONCLUSION

In considering all the evidence in the light most favorable to the jury, we conclude the evidence shows that Meyer was merely present in a place where the methamphetamine was found.[1] Therefore, we reverse the judgment of the trial court and render a judgment of acquittal.

Adrian A. Spears II, Justice

PUBLISH

---

[1]Having concluded the evidence is legally insufficient, we need not consider appellant's remaining issues.